**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| ERNESTO VARELA, et al., | ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) | Case No. 4:23-cv-01016-SEP |
| WILLIAM HAROLD HILL, et al., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM AND ORDER

Before the Court are motions to dismiss filed by Defendant William Harold Hill, Doc. [8], Defendants John Doe Officers, Doc. [4], Defendant St. Louis County Police Department, Doc. [2], and Defendants City of Wildwood and Molly Proost, Doc. [9]. The motions are denied in part and granted in part as set forth below.

### FACTS AND BACKGROUND[1]

Plaintiffs Ernesto and Claudia Varela moved to a residence on Lindy Lane in Wildwood, Missouri so their son could attend Parkway West in the Special School District of St. Louis County. Doc. [7] ¶¶ 21-23. Plaintiffs' son, O.M., is deaf, and the teachers and staff at Parkway West met O.M.'s educational needs. *Id.* ¶¶ 21-24. The Varelas were "thrilled" with the neighborhood and school until late 2016, when their relationship with their neighbor soured. *Id.* ¶¶ 24-25, 56. The neighbor, Defendant William Harold Hill, believed that the school bus that picked up O.M. would cause traffic congestion and damage on Lindy Lane, so he complained to the school district, and for a while an express medical transport was sent to pick O.M. up instead. *Id.* ¶¶ 26-30. When the Varelas requested that the bus resume picking up O.M., Hill "became infuriated and began making racial slurs and threats to the Varelas." *Id.* ¶ 33. According to the Varelas, thus began a years-long campaign of racially motivated harassment. *Id.* ¶¶ 38-41, 55-56.

The Varelas are Hispanic and Latino Americans. *Id.* ¶ 40. Mr. Hill referred to the Varelas as "wetbacks" and repeatedly yelled racist remarks when they exited their home. *Id.* ¶¶ 48-49. He threatened them, told Mr. Varela he would "kick his ass," informed them that he owned guns, and occasionally cleaned his guns outside within eyeshot of the Varelas' property. *Id.* ¶¶ 42, 49. Hill

---

[1] For purposes of the motions to dismiss, the Court takes the factual allegations in the Complaint, Doc. [7], to be true. *See Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

1

also called social services and falsely reported that the Varelas abused O.M. *Id.* ¶ 50. He posted online that the Varelas were offering free mechanical services at their residence, causing strangers to come to their home requesting mechanical repairs. *Id.* ¶¶ 72-73. Because of Hill's actions, the Varelas moved on July 14, 2018. *Id.* ¶ 55. On the day they moved, Mr. Hill threatened Mr. Varela and called the family "wetbacks." *Id.* ¶ 58.

Between late 2016 and July 14, 2018, the Varelas reported the threats, harassment, and racial slurs to the Defendant St. Louis County Police Department ("Police Department") on multiple occasions. *Id.* ¶ 57. Police responded to the Varelas' calls but never made any arrests. *Id.* ¶¶ 60, 65. If the Varelas recorded their interactions with police, the police went to Hill's residence to speak with him. *Id.* ¶¶ 66-67. The Varelas informed police that they were willing to press charges and to prosecute. *Id.* ¶ 70. The Varelas were often referred to Defendant Officer Jamie Reiter, the neighborhood police officer at the time. *Id.* ¶¶ 81, 84. At times, Reiter and other police officers attempted to persuade the Varelas not to press charges. *Id.* ¶¶ 71, 74. The officers occasionally yelled at the Varelas, and some told them to stop calling the police or they would be arrested. *Id.* ¶¶ 80, 83. After the Varelas called the police multiple times, however, the police made a report of the incidents and indicated that they would apply for charges against Hill. *Id.* ¶ 86. For reasons unknown to the Varelas, the City of Wildwood prosecutor, Defendant Molly Proost, chose not to prosecute Hill for his actions. *Id.* ¶¶ 90, 96.

On July 12, 2023, the Varelas filed a petition in state court. *See* Doc. [7]. The case was removed to federal court on August 16, 2023. Doc. [1]. Although the Varelas were initially represented by counsel, they are now proceeding pro se. Their petition—now a complaint under Federal Rule of Civil Procedure 7(a)(1)—asserts the following claims: Counts I through III are against Defendant Hill. Count I alleges that Hill denied Plaintiffs the full and equal benefits of their leasing contract under 42 U.S.C. § 1981. Doc. [7] ¶¶ 99-109. Count II alleges that Hill denied the Varelas their right to enjoy their leased property under 42 U.S.C. § 1982. *Id.* ¶¶ 110-20. Count III alleges that Hill interfered with the Varelas' enjoyment of their rights under the Fair Housing Act, pursuant to 42 U.S.C. § 3617. *Id.* ¶¶ 121-30. Counts IV and V are claims against Officer Jamie Reiter and the John Doe Officers under 42 U.S.C. § 1983. Count IV alleges violations of the Varelas' rights to police protection under the Fourteenth Amendment Equal Protection Clause, *id.* ¶¶ 131-44, and Count V alleges a conspiracy to violate the Varelas' civil rights. *Id.* ¶¶ 145-49. Count VI is a *Monell* claim against the City of Wildwood, the Police

Department, Officer Reiter, John Doe Officers, and Molly Proost. *Id.* ¶¶ 150-59; *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, (1978). Count VII alleges that Defendants Wildwood and the Police Department failed to use ordinary care in supervising the police force. *Id.* ¶¶ 160-67. Count VIII is a § 1983 claim against Defendant Molly Proost, alleging that Proost violated the Varelas' Fourteenth Amendment equal protection rights. *Id.* ¶¶ 168-81. And Count IX asserts a common law abuse of process claim against Proost. *Id.* ¶¶ 182-91.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure Rule 12(b)(6), courts shall not dismiss any complaint that states a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint is plausible on its face when the pleaded facts allow the Court to reasonably infer that the defendant is liable. *Id.* at 678. The Court views all facts and draws all reasonable inferences in favor of the nonmoving party. *Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2008) (citing *Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008)). The Court must accept the facts alleged as true, "even if doubtful." *Twombly*, 550 U.S. at 555. Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id*. (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Courts liberally construe complaints filed by laypeople. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "[I]f the essence of an allegation is discernible," the court should "construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015) (quoting *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004)). But even pro se complaints "must allege facts, which if true, state a claim as a matter of law." *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980) (per curiam). Federal courts are not required to assume facts that are not alleged, *Stone*, 364 F.3d at 914-15, nor are they required to interpret procedural rules "to excuse mistakes by those who proceed without counsel." *McNeil v. United States*, 508 U.S. 106, 113 (1993).

## DISCUSSION

**I.   Defendant Hill's Motion to Dismiss is granted in part and denied in part.**

**A. Plaintiffs fail to state a claim against Defendant Hill under 42 U.S.C. § 1981 because no contractual relationship exists between them and Hill.**

Count I alleges that Defendant Hill violated Plaintiffs' rights under 42 U.S.C. § 1981. Section 1981(a) provides:

3

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . .

The statute defines "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The Supreme Court has long "construed [§ 1981] to forbid all 'racial' discrimination in the making of private as well as public contracts." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987). "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). "Any claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship' . . . under which the plaintiff has rights." *Id.* A plaintiff must also establish that "but for" the plaintiff's race, he would have received the same rights as a white person. *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1015 (2020).

In *McDonald*, McDonald, a Black man, acted as an agent for his company in negotiating a contract with Domino's Pizza. 546 U.S. at 472, 475. When Domino's broke that contract, McDonald sued under § 1981, arguing that Domino's breached the contract because of racial animus toward McDonald. *Id.* at 473. The Court found that although McDonald had identified a contractual relationship between *his company* and Domino's, as an agent of the company, McDonald himself had "no rights and [was] exposed to no liability under the corporation's contracts." *Id.* at 477. The Court noted that if it allowed McDonald to sue Domino's under a contract that he was not a party to, it would permit "[a]ny person who is an 'actual target' of discrimination, and who loses some benefit that would otherwise have inured to him had a contract not been impaired, [to] bring a suit." *Id.* at 478.

The same principles apply here. "Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of *their own contractual relationship, not of someone else's*." *Id.* at 480 (emphasis added). "[A] plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'" *Id.* at 479-80. Plaintiffs have not alleged that they are in any contractual relationship with Hill.

4

Defendant Hill was not a party to Plaintiffs' rental contract with their private landlord.  Doc. [7] ¶ 43.  Hill had no obligations to Plaintiffs under the contract, and Plaintiffs have no contractual rights against him by virtue of their rental contract with an entirely different party.

To allow Plaintiffs to state a § 1981 claim against Hill would turn § 1981 into "an omnibus remedy for *all* racial injustice," something the Supreme Court has noted "goes beyond any expression of congressional intent [and] would produce satellite § 1981 litigation of immense scope."  *McDonald*, 546 U.S. at 479.  Therefore, Count I is dismissed.

### B.  Plaintiffs have stated a claim against Defendant Hill under 42 U.S.C. § 1982.

In Count II, Plaintiffs allege that Defendant Hill violated their rights under 42 U.S.C. § 1982, which provides:  "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."  Doc. [7] ¶¶ 110-20.  Because Congress enacted § 1982 pursuant to the Thirteenth Amendment, it does not require state action.  Section 1982 "operates upon the unofficial acts of private individuals, whether or not sanctioned by state law."  *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 438 (1968).  To establish a prima facie § 1982 claim, a plaintiff must show:  "(1) membership in a protected class; (2) discriminatory intent on the part of the defendant; and (3) interference with the rights or benefits connected with the ownership of property."  *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004).

Plaintiffs have satisfied the first prong by alleging that they are "Hispanic and Latino Americans."  Doc. [7] ¶ 40.  They have also sufficiently pled that Defendant Hill acted with discriminatory intent by specifying that he repeatedly told them to "go back to where they came from" and referred to them as terrorists, illegals, and "wetbacks."  *Id.* ¶¶ 38, 41, 49; *see Watters v. Homeowners' Ass'n at Pres. at Bridgewater*, 48 F.4th 779, 786 (7th Cir. 2022) ("[R]acial slurs are direct evidence of intentional discrimination.").

The third element is more complicated.  There is relatively little case law regarding "the applicability of Section 1982 to harassing and intimidating conduct by neighbors."  *Bryant v. Polston*, 2000 WL 1670938, at *5 (S.D. Ind. Nov. 2, 2000).  The Supreme Court has held that a variety of property interests are covered by § 1982:

> [I]n *Hurd v. Hodge*, 334 U.S. 24, the Court refused to permit enforcement of private covenants imposing racial restrictions on the sale of property even though the legal rights of blacks to purchase or to sell other property were unimpaired.  In *Jones, supra*, we held that § 1982 "must encompass every racially motivated refusal to sell or rent." 392 U.S., at 421-422.  In *Sullivan v. Little Hunting Park,*

5

> *Inc.*, 396 U.S. 229, we interpreted the term "lease" in § 1982 to include an assignable membership share in recreational facilities. In *Tillman v. Wheaton-Haven Recreation Assn., Inc.*, 410 U.S. 431, we extended that holding to cover a preference to purchase a nontransferable swim club membership.

*City of Memphis v. Greene*, 451 U.S. 100, 120-22 (1981) (footnotes omitted). Those cases "broadly construed [§ 1982] to protect not merely the enforceability of property interests acquired by black citizens but also their right to acquire *and use* property on an equal basis with white citizens." *Id*. at 120 (emphasis added). At the same time, the Supreme Court has recognized limits on what kind of interference violates § 1982. In *City of Memphis v. Greene*, the Court held that a city's decision to close a street was not enough to support a § 1982 claim because "the requirement that one public street rather than another must be used for certain trips within the city" did "not involve any impairment to the kind of property interests that we have identified as being within the reach of § 1982." *Id*. at 124.

The Court is not aware of any binding Eighth Circuit precedent on the scope of § 1982's protections. But other circuits' interpretations of § 1982 and related Supreme Court precedent do not foreclose Plaintiffs' claim. In *Okudinani v. Rose*, the Second Circuit upheld summary judgment of a § 1982 claim involving "only a few isolated incidents over a span of at least four years." 779 F. App'x 768, 771 (2d Cir. 2019). But the court recognized that cases involving "extreme acts of violence or egregious harassment" may survive, because an "individual subjected to a campaign of intimidation does not truly enjoy the freedom to hold property, a right protected by section 1982." *Id.* at 771-72. In *Watters v. Homeowners' Association at Preserve at Bridgewater*, the Seventh Circuit held that a Black couple could bring a claim under § 1982 for race discrimination where their neighbors repeatedly told them they were unwelcome, asked why "you people" moved here, suggested they live elsewhere, and referred to them using racial slurs. 48 F.4th at 782-89. And in *United States v. Brown*, the Sixth Circuit found that Jewish individuals who experienced a drive-by shooting at a synagogue had "a viable property interest protected under Section 1982." 49 F.3d 1162, 1166-67 (6th Cir. 1995). *But see id*. at 1169-78 (Batchelder, J., dissenting).

Several district courts have addressed § 1982's application to harassment by neighbors and have found that "§ 1982 is violated when neighbors harass the occupants because of their race and thereby interfere with the occupants' use of their property." *House of Providence v. Meyers*, 458 F. Supp. 3d 621, 633-34 (E.D. Mich. 2020) (residents of plaintiffs' township interfered with

6

plaintiffs' peaceful property use by using racial epithets, falsely reporting the plaintiffs to authorities, trespassing, and stalking plaintiffs' children); *see also Whisby-Myers v. Kiekenapp*, 293 F. Supp. 2d 845, 850 (N.D. Ill. 2003) (a neighbor detonating a bomb and yelling racial epithets at a homeowner gave rise to a § 1982 claim); *Byrd v. Brandeburg*, 922 F. Supp. 60, 64-65 (N.D. Ohio 1996) (granting summary judgment in favor of plaintiff's § 1982 claim where defendant threw a cocktail at plaintiff's home and used racial epithets and other violent language when referring to African-Americans).

In light of those precedents—and giving the Varelas, who are pro se, the benefit of a liberal construction—Plaintiffs have stated a claim for relief under § 1982.[2] Taking their allegations to be true, Mr. Hill subjected them to a years-long campaign of harassment, including threats of violence. He hurled racial epithets and slurs at them, Doc. [7] ¶¶ 41, 48-49, and made false reports of child abuse to the authorities, *id.* ¶ 50. Hill's harassment interfered with their use of their property when strangers approached their home for fictional mechanical repairs, when Hill yelled at them when they left their home, and when Hill threatened them. *Id.* ¶¶ 48-49, 72-73. Hill also trespassed on their land. *Id.* ¶¶ 46-47. Hill's campaign of intimidation compelled the Varelas to move after less than two years on Lindy Lane, despite the location providing excellent educational opportunities for their son. *Id.* ¶¶ 23-24, 55-56, 98. Because Plaintiffs have sufficiently pled that Defendant Hill's race-based harassment interfered with the use of their property, the Court denies Defendant Hill's motion to dismiss Count II of the Complaint.

### C. Plaintiffs plausibly allege that Defendant Hill interfered with their enjoyment of their property under 42 U.S.C. § 3617.

In Count III, Plaintiffs allege that Defendant Hill interfered with their rights under the Fair Housing Act in violation of 42 U.S.C. § 3617, Doc. [7] ¶¶ 121-30, which provides: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." To prove a violation of § 3617, Plaintiffs must prove:

> (1) [they] are members of a protected class; (2) [they] were engaged in the exercise or enjoyment of rights to equal housing or the housing advocate or provider was aiding or encouraging protected individuals in the exercise of their equal housing rights; (3) defendant was motivated by an intent to discriminate; and

---

[2] Both Plaintiffs and Defendant Hill are representing themselves. As a result, the Court has not had the benefit of thorough briefing of these issues from either party. Defendant Hill's Motion to Dismiss is one handwritten line: "I request A Motion to Dismiss for Failure To State A Claim." Doc. [8]. All parties are encouraged to seek the assistance of counsel in litigating the case, moving forward.

7

>  (4) interference on account of the protected individuals' having exercised their right to live in the neighborhood of their choice.

*Oxford House-C v. City of St. Louis*, 843 F. Supp. 1556, 1583 (E.D. Mo. 1994), *rev'd on other grounds*, 77 F.3d 249 (8th Cir. 1996); *see also Watters*, 48 F.4th at 785 (listing elements). The Eighth Circuit has indicated that the provisions of § 3617 apply to private individuals even if they do not sell or lease housing units. *United States v. Lee*, 935 F.2d 952, 957 (8th Cir. 1991) (rejecting the argument that § 3617 of the Fair Housing Act applies only to landlords and agents).

With the benefit of a liberal construction, Plaintiffs have sufficiently pled that they are members of a protected class who were exercising their rights to equal housing, and that, motivated by an intent to discriminate, Defendant Hill interfered with them on account of their having exercised their right to live in the neighborhood of their choice. 42 U.S.C. § 3604(a); *see also Watters*, 48 F.4th at 785 ("The rights under § 3604(a) that § 3617 protects from interference include post-sale activity 'that makes a dwelling unavailable to the owner or tenant, somewhat like a constructive eviction.' Such post-sale activity includes 'attempted discriminatory evictions' by interfering with an individual's § 3604(a) rights—even if the plaintiff does not actually vacate the premises.") (citations omitted) (quoting *Bloch v. Frischhol*z, 587 F.3d 771, 776, 782 (7th Cir. 2009) (en banc)). The Varelas plausibly allege that Hill waged a campaign of race-based harassment that effectively made their property unavailable to them and ultimately compelled them to move. Doc. [7] ¶¶ 55-56, 98. Therefore, Hill's motion to dismiss Count III is denied.

## II.   **Plaintiffs failed to properly serve the John Doe Officers.**[3]

The Defendant Officers filed a Motion to Dismiss for Improper Service, or In the Alternative, Motion to Quash Improper Service. Doc. [5]. They argue that Plaintiffs failed to properly serve the officers in their individual capacities by serving a clerk at the St. Louis County Police Headquarters. *Id*. at 3-4. The service return documents confirm Defendants' description of the service. "If a defendant is not properly served, a federal court lacks jurisdiction over that defendant whether or not he or she has actual notice of the suit." *Cheeks v. Belmar*, 331 F.R.D. 499, 504 (E.D. Mo. 2019) (citing *Adams v. AlliedSignal General Aviation Avionics*, 74 F.3d 882, 885 (8th Cir. 1996)). "Once a plausible challenge to the sufficiency of service of process is made,

---

[3] Plaintiffs have also failed to properly serve Defendant Jamie Reiter. Plaintiffs sued Officer Reiter in her individual capacity but attempted to serve her at the St. Louis County Police Headquarters. See Doc. [1-1] at 58. The return of service states that Reiter is "no longer employed." *Id*. In consideration of Plaintiffs' pro se status, they may have 30 days from the date of this Order to properly serve Reiter under Federal Rule of Civil Procedure 4(e). Failure to do so will result in dismissal of the claims against Officer Reiter.

the plaintiff bears the ultimate burden to make a prima facie showing that service was valid under governing law." *Id.* (citing *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1387 (8th Cir. 1995)).

Plaintiffs' service was insufficient. "[L]eaving a copy of the summons at the defendant's place of employment, when the service of process statute requires that the server leave it at the defendant's dwelling, is not a valid service of process." *Cheeks*, 331 F.R.D. at 502-05 (alteration in original) (quoting *Marshall v. Warwick*, 155 F.3d 1027, 1030 (8th Cir. 1998)). The John Doe Officers are sued in their individual capacities, Doc. [7] ¶ 13, and there is no evidence that they appointed a Police Department clerk to accept process for them. Therefore, the service of the Defendants John Doe Officers is quashed. *See* 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1354 (4th ed. 2024) ("[S]ervice generally will be quashed and the action preserved in those situations in which there is a reasonable prospect that the plaintiff ultimately will be able to serve the defendant properly."). Plaintiffs are free to attempt service again in accordance with Federal Rule of Civil Procedure 4 when they determine the identities of the John Doe Officer Defendants.

### III. Plaintiffs do not allege sufficient facts to sustain a *Monell* claim against Defendants Wildwood or the Police Department.

In Count VI, Plaintiffs bring a *Monell* claim, seeking to hold Defendants City of Wildwood and the St. Louis County Police Department liable for the unconstitutional actions of their police officers.[4] In *Monell v. Department of Social Services*, the Supreme Court held that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts . . . [a constitutional] injury . . . the government as an entity is responsible under § 1983." 436 U.S. 658, 694 (1978). "Failure to supervise employee[s]" may establish a *Monell* claim if there is "proof that the failure 'amounts to deliberate indifference to the rights of persons with whom the [employee] come[s] into contact.'" *S.M. v. Lincoln County*, 874 F.3d 581, 585 (8th Cir. 2017) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). "Deliberate indifference . . . 'is a stringent standard of fault, requiring

---

[4] Plaintiffs also name Defendants Jamie Reiter, John Doe Officers, and Molly Proost in Count VI. Plaintiffs cannot bring a *Monell* claim against individuals, and they have not pled facts sufficient to state a claim for supervisory liability. *See, e.g.*, *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015) ("When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts.").

9

proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Id.* (citing *Bd. of Cnty. Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997)).

Plaintiffs do not allege sufficient facts to indicate that a failure to train employees occurred, and that such failure to train "reflect[ed] a 'deliberate' or 'conscious' choice by [the] municipality—a 'policy.'" *City of Canton*, 489 U.S. at 389. A mere allegation that the existing training program for City employees (like police officers) reflects a policy for which the City is responsible is not enough to establish a *Monell* claim. *Id.* Plaintiffs must "prove that the deficiency in training actually caused" their injury. *Id.*

Apart from conclusory statements, Plaintiffs provide no allegations to support their claim that Wildwood and the Police Department failed to adequately train officers. Nor do Plaintiffs sufficiently allege that the municipality had a custom of discriminatory policing. Although they list a number of allegedly "unconstitutional policies and practices," Doc. [7] ¶ 154, they point to no instances of any such practices apart from officers' alleged misconduct in their own case. The Complaint thus falls far short of alleging a "widespread" discriminatory practice or custom. Although inaction by the officers involved in the underlying events might have caused frustration, the alleged facts of this case alone are insufficient to sustain a claim for *Monell* liability. Accordingly, Count VI is dismissed.

### IV.     Count VII is barred by sovereign immunity.

In Count VII, Plaintiffs allege that Wildwood and the Police Department negligently failed to supervise the police force. Doc. [7] ¶¶ 160-67. Both Wildwood and the Police Department argue that sovereign immunity protects them from suit under this common law claim. Docs. [3], [10]. Where, as here, a defendant invokes sovereign immunity in a motion to dismiss, "the petition, when viewed in its most favorable light, must plead facts, which if taken as true, establish an exception to the rule of sovereign immunity." *Phelps v. City of Kansas City*, 371 S.W.3d 909, 913 (Mo. Ct. App. 2012).

Mo. Rev. Stat. § 537.600 provides that sovereign or governmental tort immunity that existed under Missouri common law prior to September 12, 1977, remains in full force and effect for public entities "except to the extent waived, abrogated or modified by statutes in effect prior to that date." Mo. Rev. Stat. § 537.600.01. "As a municipal corporation, the City qualifies as a 'public entity' generally accorded sovereign immunity under § 537.600 from tort lawsuits." *Pinnell v. City of Union*, 579 S.W.3d 261, 265 (Mo. Ct. App. 2019). The operation and

maintenance of a police department is also protected by sovereign immunity. *Best v. Schoemehl*, 652 S.W.2d 740, 742 (Mo. Ct. App. 1983).

> A municipality has sovereign immunity from common law tort claims except:
>
> (1) where a plaintiff's injury arises from a public employee's negligent operation of a motor vehicle in the course of his employment (section 537.600.1(1)); (2) where the injury is caused by the dangerous condition of the municipality's property (section 537.600.1(2)); (3) where the injury is caused by the municipality performing a proprietary function as opposed to a governmental function; and (4) to the extent the municipality has procured insurance, thereby waiving sovereign immunity up to but not beyond the policy limit and only for acts covered by the policy (section 537.610).

*Phelps*, 371 S.W.3d at 912 (quoting *Brooks v. City of Sugar Creek*, 340 S.W.3d 201, 206 (Mo. Ct. App. 2011)). The first three exceptions do not apply in this case. Plaintiffs' injuries do not arise from a public employee's negligent operation of a motor vehicle in the course of his employment or the dangerous condition of the municipality's property. And the law enforcement functions Plaintiffs challenge—supervision of the police force and the decision to prosecute a crime—are governmental functions. *See id.* at 913 (quoting *Brooks*, 340 S.W.3d at 205). That leaves only the fourth exception.

Sovereign immunity may be waived if liability insurance is purchased or a self-insurance plan is adopted for tort claims made against the state or political subdivision. Mo. Rev. Stat. § 537.610.01. "The plaintiff shoulders the burden of proving the existence of an insurance policy and that the terms of the policy cover the plaintiff's claim." *Hendrix v. City of St. Louis*, 636 S.W.3d 889, 900 (Mo. Ct. App. 2021) (citing *Topps v. City of Country Club Hills*, 272 S.W.3d 409, 415 (Mo. App. 2008); *Brennan ex rel. Brennan v. Curators of the Univ. of Mo.*, 942 S.W.2d 432, 436-37 (Mo. Ct. App. 1997)). The Complaint does not allege that either Wildwood or the Police Department have taken out or adopted liability insurance or a self-insurance plan that might cover Plaintiffs' claim. Because Plaintiffs bear the burden of alleging facts that would establish an exception to sovereign immunity and they have not done so, Count VII is dismissed.

## V.     Plaintiffs' Claims Against Defendant Molly Proost are dismissed.

### A.  Count VIII is barred by prosecutorial immunity.

In Count VIII, the Varelas allege that Molly Proost, the prosecuting attorney for Wildwood, violated their Fourteenth Amendment equal protection rights by declining to prosecute Hill for his actions toward them. Doc. [7] ¶¶ 168-81. When the challenged actions of an official "are protected by absolute immunity, dismissal under Rule 12(b)(6) is appropriate." *Sample v.*

11

*City of Woodbury*, 836 F.3d 913, 916 (8th Cir. 2016). "Prosecutors enjoy absolute immunity in their review of and decisions to charge a violation of the law." *Id.* (citing *Imbler v. Pachtman*, 424 U.S. 409, 420-27 (1976)). In particular, the Eighth Circuit has explained, "a prosecutor is immune for conduct related to 'initiating a prosecution.'" *Stockley v. Joyce*, 963 F.3d 809, 817 (8th Cir. 2020) (quoting *Imbler*, 424 U.S. at 431). Proost's decision not to initiate prosecution against Hill falls squarely within her prosecutorial discretion. Allegations that Proost chose not to charge Hill due to racially discriminatory motives do not defeat her absolute immunity. *See Sample*, 836 F.3d at 916 ("Absolute immunity, however, 'is not defeated by allegations of malice, vindictiveness, or self-interest,' and applies even if the prosecutor's steps to initiate a prosecution are patently improper.") (citations omitted) (quoting *Reasonover v. St. Louis County*, 447 F.3d 569, 580 (8th Cir. 2006)). Accordingly, Count VIII is dismissed.

### B. Plaintiffs do not allege sufficient facts to support an abuse of process claim against Defendant Proost.

Plaintiffs also bring a Missouri common law abuse of process claim against Defendant Proost. Doc. [7] ¶¶ 182-91. "To establish an abuse of process, one must show '(1) the present defendant made an illegal, improper, perverted use of process, a use neither warranted nor authorized by the process; (2) the defendant had an improper purpose in exercising such illegal, perverted or improper use of process; and (3) damage resulted." *Schlafly v. Cori*, 647 S.W.3d 570, 573-74 (Mo. 2022) (quoting *Trs. of Clayton Terrace Subdivision v. 6 Clayton Terrace, LLC*, 585 S.W.3d 269, 277 (Mo. 2019)).

Missouri courts have defined abuse of process as "some wil[l]ful, definite act not authorized by the process or aimed at an objective not legitimate in the proper employment of such process." *Id.* at 574 (alteration in original) (quoting *Ritterbusch v. Holt*, 789 S.W.2d 491, 493 (Mo. 1990)). "The relevant question is 'whether process ha[s] been used to accomplish some unlawful end or to compel the opposite party to do some collateral thing which he . . . could not be compelled to do legally.'" *Id.* (quoting *Clayton Terrace*, 585 S.W.3d at 278). "An improper use cannot be inferred from an improper purpose. . . . [I]f one simply pursues an action to its authorized conclusion, an abuse of process does not occur, regardless of evil motive." *Id.* (citing *Clayton Terrace*, 585 S.W.3d at 278).

Plaintiffs claim that Proost misleading them by telling them that she would prosecute Hill and keep them informed of their case's status was an abuse of process. Doc. [7] ¶¶ 183-91. Defendant Proost exercised prosecutorial discretion in choosing not to prosecute Defendant Hill.

If the "process" was deciding whether or not to prosecute, she pursued it to its authorized conclusion.  As discussed above, Proost had discretion to choose whether or not to prosecute Hill and absolute immunity for that decision.  So that decision was not an abuse of process.

Neither was Proost's alleged promise to keep Plaintiffs informed about their case against Hill.  Plaintiffs claim that Mo. Rev. Stat. § 595.209 requires that they be informed of "all criminal proceedings against the Defendant Hill."  Doc. [7] ¶ 186.  The statute does grant that right to victims of dangerous felonies, murder, and other similar offenses.  But only upon written request shall these rights "be afforded to victims of all other crimes."  Mo. Rev. Stat. § 595.209.1.  Although Plaintiffs submitted a written request to be kept informed of their case's status, Doc. [7] ¶¶ 185, 187, there were no "updates" for Proost to provide, because Hill was never charged.  *Id.* ¶ 96.  Plaintiffs thus do not plausibly allege an abuse of process, and Count IX is dismissed.

## CONCLUSION

After reviewing the four motions to dismiss, Plaintiffs' claims stand as follows:  Count I against Defendant Hill is dismissed for failure to state a claim, but Counts II and III survive Hill's Motion to Dismiss.  Counts IV and V against the John Doe Officers are not dismissed, but the service is quashed for failure to comply with Federal Rule of Civil Procedure 4(e).  The claims against Defendant Reiter in Counts IV and V have also not been dismissed, but Plaintiffs have yet to properly serve Defendant Reiter.  Plaintiffs must serve Reiter in accordance with Federal Rule of Civil Procedure 4(e) no later than **April 29, 2024**, or those claims will be dismissed without further notice.

Count VI, the *Monell* claim against the City of Wildwood and St. Louis County Police Department, is dismissed for failure to state a claim.  And Count VII is dismissed because the City is entitled to sovereign immunity.  Counts VIII and IX, against Defendant Proost, are also dismissed for failure to state a claim.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Hill's Motion to Dismiss, Doc. [8], is **GRANTED IN PART**.  The motion is granted as to Count I and denied as to Counts II and III.

**IT IS FURTHER ORDERED** that Defendants John Doe Officers' Motion to Dismiss for Improper Service, or In the Alternative, Motion to Quash Improper Service, Doc. [4], is **GRANTED IN PART**.  Plaintiffs' service on the John Doe Officers is quashed.

13

**IT IS FURTHER ORDERED** that Defendant St. Louis County Police Department's Motion to Dismiss, Doc. [2], is **GRANTED**.  The claims against St. Louis County Police Department in Counts VI and VII are dismissed.

**IT IS FURTHER ORDERED** that the Motion to Dismiss filed by Defendants City of Wildwood and Molly Proost, Doc. [9], is **GRANTED**.  The claims against the City of Wildwood in Counts VI and VII are dismissed.  The claims against Defendant Proost in Counts VI, VIII, and IX are also dismissed.

**IT IS FINALLY ORDERED** that Plaintiffs have until **April 29, 2024**, to properly serve the Defendant Reiter in accordance with Federal Rule of Civil Procedure 4(e).  Failure to complete service will result in dismissal of the claims against Officer Reiter.

A separate memorandum of dismissal will issue.

Dated this 28th day of March, 2024.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE